UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MICHAEL FRANKLIN MATOS, | § | |
| | § | |
| Petitioner, | § | |
| VS. | § | CIVIL ACTION NO. 4:13-CV-343 |
| | § | |
| WILLIAM STEPHENS, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM AND ORDER

This case is before the Court on Petitioner Michael Franklin Matos' Petition for Writ of

Habeas Corpus and Respondent William Stephens' Motion for Summary Judgment.   Having

carefully considered the Petition, the Motion, and the arguments and authorities submitted by the

parties, the Court is of the opinion that Respondents' Motion should be GRANTED, and Matos'

Petition for Writ of Habeas Corpus should be DENIED.

I.      Background

The state intermediate court of appeals summarized the relevant facts of this case:

> [Matos], his wife, Amy Ayala, and their daughter lived in the same
> apartment with complainant [Nick Cunningham], [Cunningham]'s
> girlfriend, Laurie Young, and Young's 11–year old son, Daniel Lack.
> In December 2005, [Matos] told Young that he had a "crush on her."
> When Young told [Cunningham] about the comment, [Cunningham]
> felt disrespected by [Matos]. The couples agreed that [Matos] and
> Ayala should move out of the apartment at the end of the month.
>
> Around the same time, [Cunningham] introduced his friend, Jason
> Henderson, to [Matos]. Henderson agreed to sell about $2100 worth
> of marijuana to [Matos]. After [Matos]'s comment to Young,
> [Cunningham] called Henderson and told him that he wanted to "get
> back at [[Matos]] for messing with his girl." [Cunningham] and
> Henderson decided that when the transaction for the marijuana was
> supposed to take place, they would steal the money from [Matos],
> divide the money between them, and not deliver the drugs. About a
> week later, Henderson contacted [Matos] to set up a time to meet for
> the transaction. At the meeting, [Matos], who had become suspicious,
> only gave Henderson $300. Henderson took the $300 and drove away
> without   giving   [Matos]   the   drugs.   Henderson   contacted

[Cunningham], telling him he had received $300 instead of $2100 as expected. [Cunningham] and Henderson were not upset about the amount of money because they only took the money "to teach [Matos] a lesson." Although Henderson told [Cunningham] he could come get his share of the stolen money anytime, [Cunningham] never retrieved the money from Henderson. [Cunningham] later told Henderson to return the money to [Matos] because [Cunningham] discovered that the money actually belonged to Ayala.

During this time, [Matos] and Ayala decided that they would relocate to Florida when they moved out of the apartment. Relations between the two couples were "hostile and uncomfortable" after the incident with Henderson. [Matos] and Ayala were out of town for several days, but [Matos] called [Cunningham] on December 31 to "make amends." [Cunningham] agreed to allow [Matos] and Ayala to stay in the apartment for a few days, after which they would pack their things and move out.

On January 4, [Matos] went to a hunting store to purchase a firearm for "protective reasons" because he was planning to move out of the apartment that day, and he knew that [Cunningham] had recently inherited several firearms from his father. Because of his prior criminal record, [Matos] was unable to purchase a firearm, so he decided to buy a crossbow.

That night, [Cunningham] was at the apartment with Lack, while [Matos] spent the evening loading things into a moving van with a friend. At about two thirty in the morning, Young received a voice mail message from [Cunningham], in which Young could hear the conversation between [Matos] and [Cunningham]. In the message, the two were laughing and "cutting it up." Soon after, while Lack was asleep in his bedroom, an altercation began between [Matos] and [Cunningham]. Lack awoke to hear [Cunningham] say, "Why are you doing this? You're making my life miserable." Lack then heard [Cunningham] yelling for help. Lack came out of his bedroom to see [Matos] holding [Cunningham] in a headlock while the two men were struggling on the ground. Lack had some difficulty seeing without his glasses, but he was able to distinguish between the men based on their relative size and color. He could not see anything in either man's hand. [Cunningham] told Lack to call the police, but Lack was unable to find the telephone. [Cunningham] then told Lack to go to their downstairs neighbor's house to get help. However, Lack was unable to leave the apartment because the men were struggling in front of the door, blocking the exit. Lack then saw [Matos] open the door, and the two men continued to struggle onto the porch in front of the apartment. Lack ran downstairs past the men to their neighbor's door. While the men were struggling on the porch, Lack saw [Matos] hit and kick [Cunningham] repeatedly. Lack believed [Matos] was always in control during the fight. Through the metal bars of the stair

railing, Lack also saw [Matos] push [Cunningham] down the stairs in front of the apartment. [Matos] then ran to the moving van and drove away. After the neighbor did not answer, Lack stepped over [Cunningham]'s body to run back upstairs to the apartment.

When Lack reached the apartment, he located the phone and called his mother at approximately three in the morning, telling her, "Mike killed Nick." Young ordered Lack to lock himself in his bedroom until she came home from work. When Young arrived to the residence, she found her son, called 911, and attempted to resuscitate [Cunningham]. When he arrived at the scene, Houston Police Officer Button saw [Cunningham] lying at the bottom of the stairs.

Officer Duncan with the Houston Police Department's Crime Scene Unit documented the evidence. He noted that [Cunningham] had a large surface injury to his face. He also detailed knife wounds to [Cunningham]'s hand, which the officer characterized as defensive injuries. He also noted multiple stab wounds to the chest and neck area. Officer Duncan photographed the crime scene. While photographing the scene, he found blood stains on the couch that suggested someone was sitting on the couch when a serious injury to the neck or face occurred. The couch blood stains were not smeared, which suggested that the injury occurred early in the struggle and that the injured party moved from the seated position. The transfer blood stains on the baseboard of the wall near the front door suggested that a bloodstained object such as clothing, hair or a hand was pressed up against the wall. Other blood stains on the wall were "medium velocity spatter" stains, consistent with some action such as kicking or punching someone with an already existing wound. Outside the apartment, Officer Duncan noted that there were several drip stains at the top of the stairs, as if someone was seated or stopped there for a short moment. On the stairs, the blood stains were consistent with someone rolling lengthwise down the stairs because there was blood on both sides of the stairs. Officer Duncan also noted that there was no blood leaving the scene, suggesting that [Matos] did not sustain serious injuries in the fight.

Officer Duncan found two knives at the scene, one inside the apartment and one just outside the front door at the top of the stairs. He also found a 20–pound dumbbell with transfer blood stains on it, as if someone had attempted to grab the dumbbell after coming into contact with blood.

Later, but still on the same day of the murder, [Matos] called Henderson and demanded his money back from him. [Matos] told Henderson, "I killed your boy and you next." Henderson contacted police, who advised him to continue trying to contact [Matos] so that the police could locate him. The following day, [Matos] again called Henderson, describing in more detail how he killed [Cunningham]. In

that call, [Matos] stated that [Cunningham] "put up a good fight," that it took him 20 minutes to kill [Cunningham], and that Henderson "should have heard his scream when he stuck him." After Henderson told [Matos] that he had [Matos]'s money, he hung up because the conversation upset him. Henderson gave another statement to police after the second call.

Two days after the murder, police arrested [Matos] in Florida. A police officer's search of [Matos] for injuries resulting from the fight revealed only small scratches on [Matos]'s shoulder and nicks on his hands. Only one cut on [Matos]'s finger was consistent with a knife wound. He had no major cuts or lacerations, and all injuries were of the type that [Matos] could have sustained while moving. Murder charges were filed against [Matos] after he was identified by Lack in a photo line-up.

At trial, Dr. Ana Lopez, the medical examiner, testified that [Cunningham] had a total of 18 sharp force injuries on his face, neck, chest, shoulder, and hands. She stated that [Cunningham] died from the multiple stab wounds to his neck because at least one punctured his jugular vein, meaning [Cunningham] would only be able to fight for a minute or two before the blood loss would render him incapable. She also said that the wounds to [Cunningham]'s hands were defensive wounds. The toxicology report also showed that [Cunningham] had a significant amount of PCP in his blood at the time of his death.

In his defense, [Matos] called a pathologist, Dr. Paul Radelat, and a toxicologist, Terry Danielson, both of whom testified to the effects that PCP can have on a person. Both stated that PCP can make people behave in different ways but that it often makes people aggressive and violent. During cross-examination, Dr. Radelat stated that the violent behavior occurs in roughly two-thirds of people who take PCP. The other one-third of people become more sedate, as PCP was originally developed as an anesthetic. He testified that he could not determine how [Cunningham] had reacted to the PCP. Young and Henderson testified that they had seen [Cunningham] while he was under the influence of PCP many times. Both stated that [Cunningham] was calm and relaxed, and they had never seen him act aggressively while on PCP.

[Matos] testified in his own defense at trial. In his testimony, he gave a different version of the events leading up to the death of [Cunningham]. [Matos] stated that after he dropped off his friend who had been helping him move, he returned to the apartment. [Cunningham] approached [Matos] with his hood pulled over his face and punched him. [Cunningham] then pulled out a knife with his left hand, grabbing [Matos]'s shirt with his other hand. [Cunningham] told [Matos] to give him the money and get out of the apartment.

[Cunningham] also asked where the marijuana he was supposed to buy from Henderson was. [Matos] responded that he did not have any more money nor did he have the marijuana, and he took out his wallet to show he had no money. [Matos] tried to grab [Cunningham]'s knife but instead grabbed his fist, causing [Cunningham] to drop the knife. They struggled briefly, but [Cunningham] was able to pick up the knife again. [Matos] pulled out his own knife, and they began slashing at each other. [Matos] saw [Cunningham]'s hand getting cut when blocking [Matos]'s knife. [Matos] said he was able to avoid getting cut by using his knife to block [Cunningham]'s attack. [Matos] stabbed [Cunningham] in the chest, causing [Cunningham] to drop his knife again. [Matos] threw his knife and tried to gather his things to leave the house. [Matos] then saw that [Cunningham] reached his knife and was approaching him with it. When [Matos] saw [Cunningham], he reached for his crossbow, loaded it, and shot [Cunningham] in the face. The arrow grazed [Cunningham]'s face but stuck in the side of his face. [Cunningham] pulled the arrow out of his own face and attempted to stab [Matos] with the arrow. They struggled on the floor, during which time the arrow broke and [Cunningham] ended up straddling [Matos]. While [Cunningham] was on top of him, [Matos] heard [Cunningham] yell for Lack to get help. [Cunningham] reached for the 20–pound dumbbell while [Matos] reached for a knife. [Matos] reached the knife, but [Cunningham] had his right hand on [Matos]'s neck and the dumbbell in his left hand. [Matos] began blindly stabbing at [Cunningham]'s chest and neck. After being stabbed, [Cunningham] let go of the dumbbell and fell off of [Matos]. [Matos] left the knife in [Cunningham]'s neck, gathered his things, and left the apartment. After he got downstairs, [Matos] realized that he had left his wallet. He headed back to the apartment to see [Cunningham] sitting at the top of the stairs and Lack knocking on the downstairs neighbor's door. He decided not to return to the apartment, instead going to the hotel where his wife was staying. He and Ayala left immediately for Florida.

[Matos]'s description of the phone call to Henderson differs from Henderson's. [Matos] testified that he called Henderson about the stolen money but did not threaten Henderson. Instead, [Matos] said that he told Henderson that [Cunningham] tried to rob and kill him, and that they fought.

[Matos] also presented the testimony of a neighbor, Tamberlin Carr. Carr testified that Lack could not see without his glasses and that, in her opinion, Young did not always tell the truth.

*Matos v. State,* No. 01-06-01005-CR, at 1 -5, 2008 WL 659832 at *1-*5 (Tex.App.-Houston [1 Dist.] 2008).   Matos was convicted in the 262nd District Court of Harris County, Texas of first degree murder and was sentenced to 45 years imprisonment.

The 1st Court of Appeals affirmed the conviction and sentence.  *Matos v. State,* No. 01-06-01005-CR (Tex.App.-Houston [1 Dist.],2008).   The Texas Court of Criminal Appeals ("TCCA") refused Matos' petition for discretionary review.  *Matos v. State*, PDR 0167-11 (Tex. Crim. App. Mar. 9, 2011).

Matos filed an application for a state writ of habeas corpus.  The TCCA denied relief.  *Ex Parte Matos*, No. WR-74,797-02 (Tex. Crim. App., Nov. 14, 2012).  He filed this federal petition on February 6, 2013.

## II.  The Applicable Legal Standards

### A.      The Antiterrorism and Effective Death Penalty Act

This federal petition for habeas relief is governed by the applicable provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA").  *See Lindh v. Murphy*, 521 U.S. 320, 335-36 (1997).  Under the AEDPA federal habeas relief based upon claims that were adjudicated on the merits by the state courts cannot be granted unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *Kitchens v. Johnson*, 190 F.3d 698, 700 (5th Cir. 1999).  For questions of law or mixed questions of law and fact adjudicated on the merits in state court, this court may grant relief under 28 U.S.C. § 2254(d)(1) only if the state court decision "was contrary to, or involved an unreasonable application of, clearly established [Supreme Court precedent]."  *See Martin v. Cain*, 246 F.3d 471, 475 (5th Cir.), *cert. denied*, 534 U.S. 885 (2001).  Under the "contrary to" clause, this court may afford habeas relief only if "'the state court arrives at a conclusion opposite to that reached by . . . [the Supreme Court] on a

question of law or if the state court decides a case differently than . . . [the Supreme Court] has on a set of materially indistinguishable facts.'" *Dowthitt v. Johnson*, 230 F.3d 733, 740-41 (5th Cir. 2000), *cert. denied*, 532 U.S. 915 (2001) (quoting *Williams v. Taylor*, 529 U.S. 362, 406 (2000)).

The "unreasonable application" standard permits federal habeas relief only if a state court decision "identifies the correct governing legal rule from [the Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case" or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 406. "In applying this standard, we must decide (1) what was the decision of the state courts with regard to the questions before us and (2) whether there is any established federal law, as explicated by the Supreme Court, with which the state court decision conflicts." *Hoover v. Johnson*, 193 F.3d 366, 368 (5th Cir. 1999). A federal court's "focus on the 'unreasonable application' test under Section 2254(d) should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence." *Neal v. Puckett*, 239 F.3d 683, 696 (5th Cir. 2001), *aff'd*, 286 F.3d 230 (5th Cir. 2002) (en banc), *cert. denied sub nom. Neal v. Epps*, 537 U.S. 1104 (2003). The sole inquiry for a federal court under the 'unreasonable application' prong becomes "whether the state court's determination is 'at least minimally consistent with the facts and circumstances of the case.'" *Id.* (quoting *Hennon v. Cooper*, 109 F.3d 330, 335 (7th Cir. 1997)); *see also Gardner v. Johnson*, 247 F.3d 551, 560 (5th Cir. 2001) ("Even though we cannot reverse a decision merely because we would reach a different outcome, we must reverse when we conclude that the state court decision applies the correct legal rule to a given set of facts in a manner that is so patently incorrect as to be 'unreasonable.'").

The AEDPA precludes federal habeas relief on factual issues unless the state court's adjudication of the merits was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d)(2); *Hill v. Johnson*, 210

F.3d 481, 485 (5th Cir. 2000), *cert. denied*, 532 U.S. 1039 (2001).  The state court's factual determinations are presumed correct unless rebutted by "clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *see also Jackson v. Anderson*, 112 F.3d 823, 824-25 (5th Cir. 1997), *cert. denied*, 522 U.S. 1119 (1998).

### B.   The Standard for Summary Judgment in Habeas Corpus Cases

"As a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases."  *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir.), *cert. denied*, 531 U.S. 831 (2000).  In ordinary civil cases a district court considering a motion for summary judgment is required to construe the facts in the case in the light most favorable to the nonmoving party.  *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986). Where, however, a state prisoner's factual allegations have been resolved against him by express or implicit findings of the state courts, and the prisoner fails to demonstrate by clear and convincing evidence that the presumption of correctness established by 28 U.S.C. § 2254(e)(1) should not apply, it is inappropriate for the facts of a case to be resolved in the petitioner's favor.  *See Marshall v. Lonberger*, 459 U.S. 422, 432 (1983); *Sumner v. Mata*, 449 U.S. 539, 547 (1981).  In reviewing factual determinations of the Texas state courts, this court is bound by such findings unless an exception to 28 U.S.C. § 2254 is shown.

### III.   Analysis

Matos' petition raises seven claims for relief, including subclaims.   These are addressed in turn.

### A.   Extraneous Offense Evidence

In his first claim for relief, Matos contends that he was denied due process when the State was permitted to present, without prior notice, evidence that Matos threatened to kill Jason Henderson.  Respondent argues that this claim is procedurally defaulted.

1.     Procedural Default

The procedural default doctrine may bar federal review of a claim.  "When a state court declines to hear a prisoner's federal claims because the prisoner failed to fulfill a state procedural requirement, federal habeas is generally barred if the state procedural rule is independent and adequate to support the judgment."  *Sayre v. Anderson*, 238 F.3d 631, 634 (5th Cir. 2001).

Respondent concedes that Matos raised this claim on direct appeal.  He bases his procedural default argument on the fact that the state habeas court, finding that the claim was raised and rejected on appeal, stated:   "Issues that have been raised and rejected on direct appeal may not be reconsidered on a post-conviction writ."  SH at 170 (Conclusion of Law # 18).[1]

This is simply a statement that the claim was not properly before the habeas court, it does not state that Matos failed to fulfill a state procedural requirement.  He fulfilled that requirement by raising this claim in the proper forum–on direct appeal.  His having properly fulfilled the state procedural requirement on direct appeal made his attempt to raise it a second time improper.  The claim was thus not cognizable on state habeas corpus review, but it is not procedurally defaulted for purposes of federal review.

2.     Due Process

Jason Henderson testified at trial.  Henderson was Cunningham's friend who participated in the plan to steal Matos' money as revenge for Matos flirting with Cunningham's girlfriend.  Henderson testified over a defense objection that, after the murder, Matos called Henderson and "said he killed my boy and I was next."  5 Tr. at 97.[2]  Matos contends that this testimony, elicited without advance notice to the defense and over a defense objection, violates Matos' right to due process of law.

---

[1]     "SH" refers to the transcript of Matos' state habeas corpus proceedings.

[2]     "Tr." refers to the transcript of Matos' trial.

In reviewing evidentiary rulings of a state court, a federal habeas court "do[es] not sit as a super state supreme court to review error under state law." *Skillern v. Estelle*, 720 F.2d 839, 852 (5th Cir. 1983), *cert. denied*, 469 U.S. 873 (1984). A federal court may grant habeas relief "only when the trial judge's error is so extreme that it constitutes a denial of fundamental fairness under the Due Process clause." *Bailey v. Procunier*, 744 F.2d 1166, 1168 (5th Cir. 1984).

In rejecting this claim on direct appeal, the Texas Court of Appeals found that no advance notice was required under Texas law because the phone call arose out of the same incident as the murder and provided important context, and evidence concerning Matos' motive.

> [A]ppellant called Henderson on the same day appellant murdered [Cunningham]. During that call, he asked Henderson if Henderson had appellant's money, telling Henderson that he had killed [Cunningham] and that Henderson was "next." These statements, when taken together, tend to establish that appellant's motive or intent was to intentionally cause the death of [Cunningham] in retaliation for the money stolen by Henderson, at the request of [Cunningham].

*Matos,* 2008 WL 659832 at *9.

The evidence that Matos killed the victim is overwhelming. Indeed, Matos does not dispute that he killed the victim, he only disputes the finding that it was murder rather than self defense or manslaughter. In this context, Henderson's testimony is clearly relevant, the Texas courts determined that it was admissible as a matter of Texas law, and Matos makes no showing that the evidentiary ruling allowing the testimony without advance notice constitutes a denial of fundamental fairness.

Matos cites the Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36 (2004) in support of his argument. *Crawford*, however, involved the admission of an out of court statement by a witness who did not testify at trial, not by the defendant. The Court held that testimonial statements by such witnesses violated the confrontation clause of the Sixth Amendment unless the prosecution could prove that the declarant was unavailable to testify at trial and was previously subject to cross examination by the defendant. *See Crawford*, 541 U.S. at 54. Matos' claim involves

his own statement as related by a witness who testified at trial and was subject to cross examination. It does not raise a confrontation clause issue.  Matos is not entitled to relief on this claim.

B.    Sufficiency of the Evidence

Matos next contends that the evidence was insufficient to support his conviction for murder. Petitioner's argument is, essentially, that he presented evidence that he acted in self defense and that evidence undermined the State's theory.

In addressing a sufficiency of the evidence claim, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).  The sufficiency of evidence is a mixed question of law and fact. *See Gomez v. Acevedo*, 106 F.3d 192, 198 (7th Cir. 1997), *vacated on other grds.*, 522 U.S. 801 (1997).  Therefore, as noted above, this Court may grant federal habeas relief under 28 U.S.C. § 2254(d)(1) only if the state court decision "was contrary to, or involved an unreasonable application of, clearly established [Supreme Court precedent]."  *Martin v. Cain*, 246 F.3d 471, 475 (5th Cir. 2001).

In rejecting this claim on direct appeal, the Court of Appeals stated:

> Viewing the evidence in a light most favorable to the jury's verdict, the evidence shows that [Cunningham] died from multiple stab wounds that were undisputedly caused by appellant. The blood stain evidence suggests that [Cunningham] was seated on the couch when he received the wound to his face. Lack awoke when he heard [Cunningham] pleading for him to help and to call the police. Lack saw appellant always in control of the fight with [Cunningham]. Lack also saw appellant push [Cunningham] down the stairs. After appellant killed [Cunningham], he called Henderson to tell him that he would be next. Furthermore, the only wounds noted on appellant when he was arrested several days later were a few small cuts on appellant's hand, which were consistent with packing and moving. By contrast, [Cunningham] had 18 sharp-force injuries and was shot in the face with an arrow from a crossbow, which appellant bought shortly before going to [Cunningham]'s apartment when he was denied the opportunity to purchase a firearm. The medical examiner testified that [Cunningham] had defensive injuries to his hands,

> consistent with [Cunningham] trying to protect himself from the knife. Although [Cunningham] had ingested PCP, evidence shows that some people do not act violently from that drug and that [Cunningham] was not known to react violently from consuming it.
>
> We conclude the jury could have properly rejected appellant's testimony by finding it lacked credibility. Viewing the evidence in the light most favorable to the jury's verdict, we conclude that a rational trier of fact could have found against appellant on the self-defense issue beyond a reasonable doubt.

*Matos*, 2008 WL 659832 at *6 (internal citation omitted).

Clearly, there was evidence, as related by the Court of Appeals, to support the jury's finding that Matos was guilty of murder. Matos' argument comes down to a claim that the jury should have believed his claim of self defense. The jury, however, is well within its bounds to make credibility determinations. "It is well-settled that credibility determinations are the sole province of the jury." *United States v. Cathey*, 259 F.3d 365, 368 (5th Cir. 2001). The evidence, viewed in the light most favorable to the prosecution, clearly supports a guilty verdict. Therefore, the Texas Court of Appeals' finding that the evidence was sufficient is reasonable, and is entitled to deference. Matos is not entitled to relief on this claim.

C.    Ineffective Assistance of Counsel

In his first and fifth claims for relief, Matos contends that he received ineffective assistance of counsel. To prevail on a claim for ineffective assistance of counsel, Petitioner

> must show that . . . counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984). In order to prevail on the first prong of the *Strickland* test, Petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness. *Id.* at 687-88. Reasonableness is measured against prevailing

professional norms, and must be viewed under the totality of the circumstances.  *Id.* at 688.  Review of counsel's performance is deferential.  *Id.* at 689.

Because the Texas state courts have already decided these claims against Matos, he faces a very high burden in this federal habeas corpus proceeding.

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.,* at 689 [104 S.Ct. 2052]; *Lindh v. Murphy,* 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles* [*v. Mirzayance*], 556 U.S., at ----, 129 S.Ct. [1411], at 1420. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at **----,** 129 S.Ct., at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland* 's deferential standard.

*Premo v. Moore*, U.S, 131, S. Ct. 733, 740 (2011).

1.    Failure to Investigate

In his third claim for relief, Matos contends that counsel failed to conduct an adequate pretrial investigation.  Matos contends that such an investigation would have led counsel to two witnesses, Richard Perez and George Anthony Furr, who could have provided helpful testimony.

"To establish that an attorney was ineffective for failure to investigate, a petitioner must allege with specificity what the investigation would have revealed and how it would have changed the outcome of the trial."  *Miller v. Dretke*, 420 F.3d 356, 361 (5th Cir. 2005).  Perez submitted an affidavit is which he stated that he called the residence Matos shared with Cunningham on several occasions in December 2005 and January 2006, and that Cunningham expressed anger and hostility toward Matos, stating that he wanted to make Matos "look like a 'screen door.'"  Petition, Exhibit A at 1.  He also states that he attempted to call trial counsel several times, but was unable to reach him

and that counsel did not return his calls.  *Id.* at 2.  He further states, however, that he was unable to testify because he was working two jobs at the time.  *Id.*

Furr identifies himself as Matos' brother.  Petition, Exh. B at 1.  He attests that he called the residence and that Cunningham made threatening remarks toward Matos.  *Id.*  Furr does not state that he made any attempt to contact counsel or was otherwise available to testify.

The Fifth Circuit has held that "complaints based upon uncalled witnesses [are] not favored because the presentation of witness testimony is essentially strategy and thus within the trial counsel's domain, and . . . speculations as to what these witnesses would have testified is too uncertain."  *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985) (citing *United States v. Cockrell*, 720 F.2d 1423, 1427 (5th Cir. 1983), *cert. denied*, 467 U.S. 1251 (1984)).  "In order for the appellant to demonstrate the requisite *Strickland* prejudice, the appellant must show not only that this testimony would have been favorable, but also that the witness would have testified at trial."  *Id.*

Under circumstances more compelling than those presented here, the Fifth Circuit  declined to find ineffective assistance of counsel.  In *Foster v. Johnson*, 293 F.3d 766 (5th Cir. 2002), the petitioner submitted affidavits from several family members stating that they were not contacted by counsel; that they would have been available to testify at the punishment phase of the petitioner's capital murder trial; and that they could testify as to areas no other witness addressed, the petitioner's drinking problem and his father's drinking problem during the petitioner's youth.  *Id.* at 783.  No such evidence was presented at trial.  The Mississippi Supreme Court concluded that these additional witnesses would not have altered the outcome of the trial, because other mitigating evidence was present.  The Fifth Circuit held that the petitioner was not entitled to relief on the basis of ineffective assistance of counsel.  *Id.* at 783-84.

In this case, Petitioner does not contend, and the record does not show, that counsel failed to call specific witnesses to testify, as to subjects that other witnesses did not address.   Other evidence

established that the relationship between Matos and Cunningham was tense because Matos had a crush on Cunningham's girlfriend.

On a claim of ineffective assistance of counsel, review of counsel's performance must be highly deferential. *Strickland*, 466 U.S. at 689. The decision of which witnesses to call at trial is especially entitled to deference under *Strickland* "because the presentation of witness testimony is essentially strategy and thus within the trial counsel's domain." *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985).

Neither Perez nor Furr states that he was available to testify at Matos' trial. Indeed, Perez affirmatively states that he could not testify because he was working two jobs at the time. Moreover, Matos never asserts that he told counsel that Perez or Furr might have helpful evidence.

The state habeas court found that counsel conducted an adequate pretrial investigation by reviewing the state's file, visiting Matos in jail on numerous occasions, speaking with Matos' family, visiting the crime scene, interviewing personnel from the Harris County Medical Examiner's office, and hiring an investigator and a pathology expert. SH at 165-66 (Finding of Fact # 3). The court further found that Matos did not inform counsel that Perez or Furr existed and might be helpful witnesses. *Id.* at 166 (Finding of Fact # 4). The court concluded that counsel's performance did not fall below an objective standard of reasonableness, or that any allegedly deficient performance prejudiced Matos. *Id.* at 167-68 (Conclusions of Law #  1-5). The state habeas court's findings are well supported by the record, and its conclusions are not an unreasonable application of the *Strickland* standard to the facts of this case. Accordingly, the state habeas court's conclusion that counsel did not render ineffective assistance by failing to investigate is entitled to deference under the AEDPA.

## 2.   Allowing Evidence of Extraneous Offense

Before trial, counsel filed a motion *in limine* to bar testimony that the transaction in which Henderson and Cunningham stole Matos' money was a sale of marijuana. The trial court granted the

motion.  During trial, counsel changed his mind and allowed testimony that the transaction involved

the sale of marijuana.  Matos now argues that this was ineffective.

In connection with the state habeas corpus proceeding, counsel submitted an affidavit in

which he states:

> I intentionally violated my own motion *in limine* based on trial
> strategy.  I had initially hoped to keep out the fact that [Cunningham]
> and [Matos] had been engaged in a scam marijuana deal.  For obvious
> reasons I did not want the jury to view [Matos] as a drug dealer.  As a
> result, the trial court, based on my motion, limited the State to
> describing the marijuana deal as simply a generic deal – without
> specifying the item to be transacted.   Through the course of
> testimony, and despite my best efforts, it became clear that the
> undescribed "deal" involved some sort of illicit contraband.  Rather
> than permitting the jury to speculate whether the contraband involved
> cocaine or firearms or something worse than marijuana, I decided it
> was prudent to simply allow in evidence that the "deal" involved the
> arguably more innocuous contraband of marijuana.

SH at 162.  The state habeas court found this explanation credible, finding "that counsel chose to

violate his own motion *in limine* and admit that [Matos] was involved in a marijuana transaction

based on trial strategy."  SH at 166 (Finding # 5).  The court further found that Matos failed to prove

the strategy was unreasonable.  *Id.* at 169 (Conclusion # 12).

> Judicial scrutiny of counsel's performance must be highly deferential.
> It is all too tempting for a defendant to second-guess counsel's
> assistance after conviction or adverse sentence, and it is all too easy
> for a court, examining counsel's defense after it has proved
> unsuccessful, to conclude that a particular act or omission of counsel
> was unreasonable.    A fair assessment of attorney performance
> requires that every effort be made to eliminate the distorting effects of
> hindsight, to reconstruct the circumstances of counsel's challenged
> conduct, and to evaluate the conduct from counsel's perspective at the
> time. Because of the difficulties inherent in making the evaluation, a
> court must indulge a strong presumption that counsel's conduct falls
> within the wide range of reasonable professional assistance; that is,
> the defendant must overcome the presumption that, under the
> circumstances, the challenged action might be considered sound trial
> strategy.

*Strickland*, 466 U.S. at 689 (internal citations and quotation marks omitted).  As the *Strickland* court concluded:  "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . .."  *Id.* at 690.

Counsel's decision to violate his own motion was reasonable trial strategy.  He reasonably feared that if the jury was not informed that the transaction involved marijuana, jurors might infer it involved something more prejudicial to Matos' case.  That decision was a reasonable attempt to make his case as strong as possible.  Matos thus fails to demonstrate that counsel was deficient in allowing this evidence, and his claim of ineffective assistance of counsel fails.

3.      Failure to Present Self Defense

In his next ineffective assistance claim, Matos argues that counsel failed to present a strong enough case for his defensive theory of self defense.  He points to an affidavit by his wife, Amy Ayala, in which Ayala asserts that Cunningham threatened Matos because Matos made a pass at Cunningham's wife.  She further asserts that Matos, shortly after killing Cunningham,  stated that Cunningham tried to kill him, that Matos intended to turn himself in after moving his family to Florida, and that Matos never threatened Jason Henderson.

Counsel's affidavit states that he interviewed Ayala and intended to call her as a witness during the penalty phase of the trial.  He asserts, however, that she made several statements in the interview that flatly contradict her affidavit.  She told counsel that Matos fled Texas to avoid arrest and not, as she states in her affidavit, out of concern for the safety of his family.  She stated that she had no recollection of Matos having a conversation with Henderson and could not refute Henderson's claim that Matos threatened him.  Counsel concluded that Matos' flight from Houston and the threatening and arrogant tone of his post-killing conversation with Henderson were the strongest pieces of evidence against him.  Based on this, he made a strategic decision not to call Ayala as a witness during the guilt-innocence phase because her testimony "would have undoubtedly shed an even more intensive negative light on [Matos'] flight without refuting the fact that Ms. Ayala

could have left for Florida without [Matos] and [Matos] could and should have immediately reported his altercation with [Cunningham] to the police." SH at 162.

As discussed above, counsel's "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . .." *Strickland*, 466 U.S. at 690. Counsel offers a thoughtful strategic explanation for his decision not to call Ayala. The state habeas court found counsel's affidavit credible, and Ayala's affidavit not credible. SH at 165-66. Because counsel had a valid strategic reason for his decision not to call Ayala, his decision not to call her does not constitute ineffective assistance of counsel.

    4.    <u>Jury Instructions</u>

In his final claim of ineffective assistance of counsel, Matos argues that counsel was ineffective by failing to request a jury instruction on the lesser included offense of manslaughter. Counsel attests that he did not request a charge on manslaughter

> because there was no evidence that [Matos'] *mens rea* was 'reckless' as defined by statute. I believe that [Matos] had a viable self-defense claim and that was the singular defensive issue in his case. The entirety of the evidence was that [Matos] intentionally and knowingly (not recklessly) cause[d] serious bodily injury to [Cunningham] caus[ing Cunningham]'s death. The only question involved whether his intentional actions were justified. In my view there was no plausible way to view his conduct as reckless.

SH at 163.

The evidence showed that Matos stabbed Cunningham 18 times, shot him in the face with a cross bow, and pushed him down a flight of stairs. In light of this rather powerful evidence of intent, it cannot be said that counsel's judgment that the evidence did not support a finding of recklessness amounted to deficient performance.

    D.    <u>Actual Innocence</u>

In his fourth claim for relief, Matos contends that he is actually innocent of the crime. "Claims of actual innocence based on newly discovered evidence have never been held to state a

ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera v. Collins*, 506 U.S. 390, 400 (1993). This is so because "federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution – not to correct errors of fact." *Id.*

Matos cites *Schlup v. Delo*, 513 U.S. 298 (1995). That case, however, holds that a showing of actual innocence can allow a petitioner to avoid a procedural bar to a claim, not that actual innocence is cognizable as a freestanding claim for relief. Respondent argued that one of Matos' claims is procedurally barred, but this opinion rejects that argument and denies all of Matos' claims on the merits. *Schlup* thus provides no support for Matos' position. Under *Herrera*, Matos is not entitled to relief on this claim.

IV.    Conclusion

For the foregoing reasons, Matos fails to raise a viable claim for habeas relief. His petition must be dismissed with prejudice for the reasons stated in this opinion.

V.    Certificate of Appealability

Matos has not requested a certificate of appealability ("COA"), but this Court may determine whether he is entitled to this relief in light of the foregoing rulings. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000) ("It is perfectly lawful for district court's [sic] to deny COA *sua sponte*. The statute does not require that a petitioner move for a COA; it merely states that an appeal may not be taken without a certificate of appealability having been issued.") A petitioner may obtain a COA either from the district court or an appellate court, but an appellate court will not consider a petitioner's request for a COA until the district court has denied such a request. *See Whitehead v. Johnson*, 157 F.3d 384, 388 (5th Cir. 1988); *see also Hill v. Johnson*, 114 F.3d 78, 82 (5th Cir. 1997) ("[T]he district court should continue to review COA requests before the court of appeals does."). "A plain reading of the AEDPA compels the conclusion that COAs are granted on an issue-by-issue

basis, thereby limiting appellate review to those issues alone." *Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir. 1997).

A COA may issue only if the petitioner has made a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); *see also United States v. Kimler*, 150 F.3d 429, 431 (5th Cir. 1998).  A petitioner "makes a substantial showing when he demonstrates that his application involves issues that are debatable among jurists of reason, that another court could resolve the issues differently, or that the issues are suitable enough to deserve encouragement to proceed further." *Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir.), *cert. denied*, 531 U.S. 966 (2000).   The Supreme Court has stated that:

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  However, "the determination of whether a COA should issue must be made by viewing the petitioner's arguments through the lens of the deferential scheme laid out in 28 U.S.C. § 2254(d)."  *Barrientes v. Johnson*, 221 F.3d 741, 772 (5th Cir. 2000), *cert. dismissed*, 531 U.S. 1134 (2001).

This Court has carefully considered Matos' claims.  The Court finds that the claims are foreclosed by clear, binding precedent.  This Court concludes that under such precedents, Matos has failed to make a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  This Court concludes that Matos is not entitled to a certificate of appealability on his claims.

VI.   Order

For the foregoing reasons, it is ORDERED as follows:

A.     Respondent's motion for summary judgment (Doc. # 9) is GRANTED;

B.      Petitioner Michael Franklin Matos' Petition for Writ of Habeas Corpus (Doc. # 1) is

in all respects DENIED; and

C.      No certificate of appealability shall issue.

The Clerk shall notify all parties and provide them with a true copy of this Memorandum and

Order.

SIGNED on this 19th day of February, 2014.

_____
Kenneth M. Hoyt
United States District Judge